IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Christians in the Workplace Networking
Group, Plaintiff                    :    Civil Action:    1:22-cv-00267-KK-KRS
           v.

National Technology and Engineering Solutions of Sandia, LLC,    et al,

MOTION (Renewed)for Summary Judgement and for Injunctive Relief

Table of Contents

I. Law                                                              Page
  1.  Reasonable Accommodation                                       2
  2.  Freedom of Association                                         3
  3.  Religious Discrimination                                       3
  4.  Exemption from Title VII                                       4
  5.  Differential Treatment                                         5
  6.  Viewpoint Discrimination                                       5
  7.  Religious Freedom Restoration Act (RFRA)                       6
  8.  First Amendment                                                7
  9.  Courts do Not Decide Religious Doctrine                        7
  10. Injunctive Relief                                              7

II. Argument
  A.  Sandia made no attempt to accommodate. Hardship-- litigation risk- is speculative     11
  B.  CWNG has a Freedom of Association right to associate based on religious beliefs     12
  C.  CWNG was deprived of employment opportunities and privileges of employment based on religion, violating 42 U.S.C. §2000e-2 & §2000e-2(a).     12
  D.  CWNG, exempt from Title VII as a religious organization, 42 U.S.C. §2000e-1(a) (1970) & Supp II (1972) may have leaders of its religion and remove them. HR008 ignores this.     13
  E.  Sandia treated other ERGs differently than CWNG regarding speakers, funding, who could be leaders, flying of a flag, discussion at executive council meetings, becoming an ALL Faiths Group, removing sponsorship and response to complaints, on the basis of its beliefs.     14
  F.  Hostility to CWNG's religious beliefs included a manager's telling Colombel the entire management chain was upset at him for using the Christian tagline, the Lab Director's telling him there is no advocacy allowed for the Christian world view and Marie Miller that CWNG could not have a scientific presentation because it was "too controversial", the firing of its executive sponsor, training materials indicating Christians were insiders who had to relinquish privilege, statements at the training he was"disgusting" and when they found out he was a Christian in front of the whole group "I knew there was something about you that makes me sick to my stomach," and e-mails they "don't like" complaints he made on training.     20
  G.  RFRA applies because Sandia is an instrumentality of the Department of Energy     25
  H.  Sandia has no business deciding what statement of faith & leadership requirements it approves of and targeting CWNG for refusing to remove them. As there is differential treatment and religious animosity, Injunctive Relief to reinstate CWNG as an employee resource group is required by law.     26

1

I. Law
1. <u>Reasonable Accommodation</u>

all aspects of religious…practice, which employer must accommodate unless it demonstrates it is unable to reasonably accommodate…religious observance or practice without undue hardship on the conduct of the employer's business. 42 U.S.C. §2000e(j). The employee establishes a prima facie case by showing he holds a sincere religious

belief that conflicts with an employment requirement, informed his employer, and was

disciplined for not complying with it. <u>Thomas v. Nat'l Ass'n of Letter Carriers</u>, 225 F.3d

1149, 1155-56 & n.6 (10th Cir. 2000).  Once a prima facie case is established, Defendant

must 1) rebut Plaintiffs' claims; 2) prove it provided reasonable accommodation or 3)

prove could not do so without undue hardship, id at 1156 . <u>EEOC v. Abercrombie & Fitch</u>

<u>Stores, Inc.</u>, 135 S.Ct. 2028, 2031–32 (2015) held accommodate is allowing plaintiff to

engage in the religious practice despite employer's rules to the contrary. Id., at 2032 n.2.

A neutral policy does not absolve employer of its obligation to accommodate.Title VII

requires otherwise-neutral policies to give way to the need for an accommodation. Id.,   at

2034. Employer must attempt a reasonable accommodation. <u>Ansonia Bd. of Educ. v.</u>

<u>Philbrook</u>, 479 U.S. 60, 68-69 (1986). Where an employer has made no efforts to do so, it

may only prevail if it shows that no accommodation could have been made without undue

hardship. <u>*Toledo v. Nobel-Sysco, Inc.*</u>, 892 F. 2nd 1481, 1490 (10th Cir. 1989)

In <u>Banks v. Service America Corp</u>., 952 F. Supp 703 (D. Kan. 1996),   the court held:

Service America did not attempt to accommodate plaintiffs' religious practice of blessing food service customers. .. *Toledo, supra…h*eld:…Employers…should be able to meet their burden by showing that no accommodation is possible….such situations will also be rare. We…will be "skeptical of hypothetical hardships." "The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted." 892 F. 2nd at 1489-1490. .. hardship asserted must be "real" rather than "speculative."   *Toledo,id 1492*; B*rown v. General Motors Corp.,* 610 F. 2nd 956. 961 (8th Cir. 1979),*Burns v. Southern Pac. Transp. Co.,589 F. 2nd 403* (9th Cir. 1978)…an employer "stands on weak ground when

2

advancing hypothetical hardships in a factual vacuum." *Brown, id at 960*. .. An employer . . . [must] show . . . actual imposition on coworkers or disruption of the work routine." *Burns,* 589 F. 2nd at 407..defendant has not demonstrated as a matter of law that plaintiffs' blessings… imposed undue hardship on Service America's operations or materially disrupted its work routine…the record is devoid of any evidence that Service America lost any business due to a resurgence of sack-lunch activity occasioned by plaintiffs' practices… fear that customers would boycott Service America and bring sack lunches from home to avoid plaintiffs' religious speech…is more hypothetical than real…that plaintiffs' greetings might eventually impair the contractual relationship between Service America and General Motors is… speculative at best….20 to 25 complaints over a three-month period presented no material problem for Service America….

2. Freedom of Association

Freedom of association includes the right to affiliation with a group and is a form of

expressing opinion, Griswald v. Connecticut, 381 U.S. 479, 483 (1965); Hosanna-Tabor

Evangelical Church & School v. EEOC, 565 U.S. 171, 189 (2012). Denial of official recognition,

without justification, burdens or abridges that right. Healy v. James, 408 U.S. 169, 181 (1972)

3. Religious Discrimination

An employer may not limit, segregate, or classify employees deprive employment opportunities or affect an employee's status as an employee, 42 U.S.C. §2000e-2 or discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's religion. 42 U.S.C. §2000e-2(a).
In CLS v. Eck, 625 F. Supp. 2nd 1026 (D. Mont. 2009), an organization with a statement of faith

(SOF) and a clause to discipline leaders (DC) proved discrimination by evidence a non-

discrimination policy targeted religious beliefs or was selectively applied. In CLS v. Walker, 453

F. 3rd 853 (7th Cir. 2006), Plaintiff was derecognized when it refused to drop its SOF and DC:

it is intrusion into the internal affairs of an organization to force a group to accept members it does not desire…Forcing Plaintiff to accept as members those who would approve of or engage in homosexual conduct would cause the group as it currently identifies itself to cease to exist. This burdens the ability to express ideas. Defendants have no interest in forcing Plaintiff to accept members whose activities violate its creed except eradicating… beliefs…in the creed… the antidiscrimination policy has not been applied in a neutral way.Plaintiff is the only group stripped of its recognized status due to [discrimination]…prohibited by EEO policy. The Muslim group limits membership to muslims, the Adventists to Adventists and Young Womens' coalition is for women. Id, 861-863, 863-867.

In Hsu v. Roslyn Union F.S.D. No 3, 85 F. 3rd 839 (2nd Cir. 1996), an after-school bible club

was denied recognition as only Christians could be club officers. The court held

The… Christian officers requirement…is essential to the expressive content of the meetings and the preservation of the group's purpose and identity…the…policy violates the nondiscrimination policy…the word speech includes the …leadership policy…reasonably designed to ensure that a certain type of religious speech will take place at the club's meetings…As in Hurley v. Irish American Gay, Lesbian and Bisexual Group of Boston, 115 S. Ct. 2338 (1995), the club's decision to exclude is based on its desire to preserve the content of its message…having Christian leaders necessarily shapes the content of the religious speech at the meeting because the nature and quality of the religious speech at the meetings is dependent upon the religious commitment of the officers…meetings promote and express the Christian religious experience in an integral way…the leadership provision is defensible    ….the right to free association for expressive purposes is implicit in the 1st Amendment Free Speech guarantee. Abood v. Detroit Board of Educ., 431 U.S. 209, 233 (1977)… A decision not to associate with other students may constitute an exercise of the right of expressive association…a regulation that prevents a group from excluding certain people may impair the ability of the original members to express only those views that brought them together. Roberts v. US Jaycees, 468 U.S. 609, 623 (1984)…an association might be able to show it…will not be able to advocate its desired viewpoints nearly as effectively if it cannot confine its members to those who share … the same religion. New York State Clubs Association v. City of New York, 487 U.S. 1, 13 (1988)…when a religious…club excludes people of other religions from conducting its meetings…to protect the expressive content of the meetings, a school's decision to deny recognition to the club because of the exclusion is a decision based on the content of the speech. …Plaintiff could [not] abandon the leadership requirement of its constitution without suffering any tangible harm…the Civil Rights Act of 1964 exempts religious organizations from the act's ban on religious discrimination in employment…The club reasonably insists that the actual leaders of the Christian prayer be Christian… only they have the necessary faith and commitment to do the job. ..disputes that hinge on a student's supposed religious qualifications can be resolved internally by the club members….

Id, 848-850, 856-859, 862-869.

4.  Exemption from Title VII

Title VII exempts religious organizations from its prohibition against religious discrimination in

employment, Corp. of Presiding Bishops v. Amos, 483 U.S. 327, 329 (1987), "with respect to the

employment of individuals of a particular religion to perform… work connected with…its

activities." 42 U.S.C. §2000e-1(a) (1970) & Supp II (1972) A religious organization may hire

those of its own religion, EEOC v. Mississippi College, 626 F. 2nd 477, 486 (5th Cir. 1980),

discipline, Hall v. Baptist Memorial Health Care Corp, 215 F. 3rd 618, 623, 625 (6th Cir. 2000),

fire for failure to ascribe to a statement of faith. Killinger v. Sanford University, 113 F. 3rd 196,

198 (11th Cir. 1997), and decide matters of doctrine, Kedroff v. St. Nicholas Cathedral of Russian

Orthodox Church in North America, 344 U.S. 94, 116 (1952), and rules for discipline & disputes.

Serbian Eastern Orthodox Diocese for U.S. and Canada, 426 U.S. 696 , 724 (1976).

5.  Differential Treatment
  In Alpha Delta Chi v. Reed, 648 F. 3rd 790 (9th Cir, 2011), permitting the African Student Drama

Ass. to limit leaders to Africans established discrimination against a sorority which required its

members be Christians and    was denied recognition by a university. Id, 796, 804. There was

no different treatment in CLS v. Martinez, 561 U.S. 661 (2010). Not being approved as a student

organization, CLS used school facilities, and campus bulletins for events. Id, 673, 691.

6.  Viewpoint Discrimination
Plaintiff must prove Defendant intentionally discriminated against him because of his religion, St.

Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-12, (1993), relying on direct or circumstantial

evidence , McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973), to show a prima

facie case of discrimination. Thomas v. Nat'l Ass'n of Letter Carriers, 225 F.3d 1149, 1155 (10th

Cir. 2000). Defendant must prove facially nondiscriminatory reason for its actions.Reynolds v.

Sch. Dist. No. 1, 69 F.3d 1523, 1533 (10th Cir. 1995). If so, Plaintiff must show Defendant's

proffered reason is pretextual, that is, "unworthy of belief,."Beaird v. Seagate Tech., Inc., 145

F.3d 1159, 1165 (10th Cir. 1998). by "implausibilities, inconsistencies, incoherencies, or

contradictions in the reasons for its action that a reasonable factfinder could rationally find

unworthy of credence and infer that employer did not act for the asserted non-discriminatory

reasons." Morgan v. Hilti, Inc., 108 F. 3rd 1319, 1323 (10th Cir. 1997). The First Amendment is

violated where discretionary application of a law involves a negative judgment on religious

activity. <u>Church of the Lukumi Aye, Inc. v. City of Hialeah</u>, 508 U.S. 520, 533, 537-538 (1993).

In <u>Fulton v. City of Philadelphia</u>, 141 S. Ct. 1868 (2021)

a…system of…discretionary exceptions…renders the contractual non-discrimination requirement not generally applicable...The contractual non-discrimination requirement imposes a burden on CSS's religious exercise and does not qualify as generally applicable…A government policy can survive strict scrutiny only if it advances "interests of the highest order" and is narrowly tailored to achieve those interests. *Lukumi*, 508 U. S., at 546…so long as the government can achieve its interests in a manner that does not burden religion, it must do so…Under <u>Gonzales</u> v. <u>*O Centro Espírita Beneficente União do Vegetal*</u>,546 U.S. 418, 430–432 (2006)…courts must "scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." id, at 431. ..[Deefendant must show why it denied] an exception t….. As for liability, the City offers only speculation that it might be sued… Such speculation is insufficient to satisfy strict scrutiny, see *Brown* v. *Entertainment Merchants Assn.*, 564 U.S. 786, 799–800 (2011)… a system of exceptions under the contract undermines the City's contention that its non-discrimination policies can brook no departures. See *Lukumi*, 508 U. S., at 546–547. The City offers no compelling reason why it has a particular interest in denying an exception to CSS while making them available to others…refusal…to contract with CSS for…foster care services unless it agrees to certify same-sex couples as foster parents…violates the First Amendment. Id, 141 S. Ct. 1876-1882.

In <u>Masterpiece Cake Shop Ltd. V. Colo. C.R. Comm,</u>, 138 St. Ct. 1719 (2018) some elements of a clear and impermissible hostility toward…religious beliefs that motivated his objection…. Commissioners implied that religious beliefs and persons are less than fully welcome… One …suggested that Phillips can believe "what he wants to believe," but cannot act on his religious beliefs "if he decides to do business in the state.": "[I]f a businessman wants to do business in the state and he's got an issue with the—the law's impacting his personal belief system, he needs to look at being able to compromise." …"Freedom of religion and religion has been used to justify all kinds of discrimination throughout history, whether it be slavery…the holocaust… hundreds of situations where freedom of religion has been used to justify discrimination. And to me it is one of the most despicable pieces of rhetoric that people can use to—to use their religion to hurt others." …[comparing] invocation of his sincerely held religious beliefs to defenses of slavery and the Holocaust….these statements cast doubt on the fairness and impartiality of the Commission's adjudication… assessment of offensiveness….sends a signal of official disapproval of Phillips' religious beliefs….[this] violated the State's duty under the First Amendment not to base…regulations on hostility to a religion….[so the] laws be applied in a manner…neutral toward religion….Id, 138 S. Ct. 1729-1732.

7. <u>Religious Freedom Restoration Act (RFRA)</u>

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability. 42 USC §§2000bb-1(a), bb-2, bb-3 (3)

& bb-4. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006) held RFRA's test is satisfied if the government demonstrates a compelling interest in the application of the law to the particular claimant whose religious rights are burdened rather than one in uniform application of the law. Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014) held RFRA's protects religious practices of for-profit corporations. Forced provision of cost-free contraceptives to employees substantially burdened the owners' exercise of religion and was not the least restrictive means of achieving the interest in mandating such coverage in violation of their sincere religious beliefs. Alternatives could achieve government interests. id

A.   Instrumentality

Government includes an instrumentality, official or other person acting under color of law of the US. 42 U.S.C.§2000bb-2(1). Lugar v. Edmondson Oil Co., 457 U.S. 922 (1980) held the tests included whether there was a symbiotic relationship, state commendation and encouragement, joining participation, public function, Rendell-Bala v. Kohn, 457 U.S. 830 (1982), and if it serves a uniquely public function, exclusive function of the state. Id, 840, 842.

8. 1st Amendment

Banning a group from a campus is viewpoint discrimination if speech is restricted because the views expressed are abhorrent. Healy v James, 408 U.S. 169. 187-188 (1972). In Widmar v. Vincent, 454 U.S. 263 (1981) singling out religious organizations for disadvantageous treatment was subjected to strict scrutiny; maintaining separation of church and state did not justify viewpoint discrimination against religious speech. Id., 270, 276. Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819 (1995) held a university may not deny funding to distribute newspapers because they discussed issues from a Christian perspective.

Disfavoring religious editorial viewpoints is impermissible viewpoint discrimination. d, 830-831.

9. Courts do Not Decide Religious Doctrine

Civil courts not decide questions of religious doctrine but permit this to be determined by a

religious group *Serbian Orthodox Diocese*, 426 U.S. at 426 U. S. 724-725; Watson v. Jones, 13

Wall. 679, 80 U. S. 733-734 (1871); Jones v. Wolf, 443 U.S. 595, 602. (1979)

10. Injunctive Relief

A court may grant injunctive relief based on (1) likelihood of success on appeal; (2) threat of

irreparable harm if the injunction is not granted; (3)"the absence of harm to opposing parties if it

is granted; and (4) "any risk of harm to the public interest." Homans v. City of Albuquerque, 264

F.3d 1240, 1243 (10th Cir. 2001).Loss of First Amendment freedoms is irreparable injury.*Elrod*

*v. Burns*, 427 U.S. 347 (1976) for which money damages are not adequate. Injunctions protecting

such freedoms are in the public interest. Christian Legal Society v. Walker held

CLS has shown a likelihood that SIU violated CLS's free speech  rights by ejecting it from a
speech forum in which it had a right to remain….[based on]…federal or state laws concerning
nondiscrimination… CLS's statement of faith specifies… a belief in the sinfulness of "all acts of
sexual conduct…[including]fornication, adultery, and homosexual conduct."…we are skeptical
that CLS violated SIU's Affirmative Action/EEO policy. First, CLS does not employ anyone.
Second, it is not readily apparent…that CLS should be considered  an SIU "education
opportunity" for purposes of applying the policy….the…policy…applies to SIU, and there is no
support in the record for the proposition that CLS is an extension of SIU. CLS is a private
speaker…receiving (until…derecognized) the public benefits associated with recognized student
organization status….subsidized student organizations at public universities are engaged in
private speech, not…state-endorsed messages. *Rosenberger v. Rector Visitors of Univ. of Va.,
515 U.S. 819, 833-834 (1995)…C*LS has demonstrated a likelihood of success on the threshold
question of whether either of SIU's stated grounds for derecognition actually applies….[an
on]both its expressive association and free speech claims…Implicit in the First Amendment
freedoms of speech, assembly, and petition is the freedom to… associate. *Rumsfeld v. Forum for
Academic Institutional Rights, Inc.,* 126 S.Ct. 1297, 1311-1312.(2006) ("FAIR"); *Dale,* 530 U.S.
at 647-48, 120 S.Ct. 2446; Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984); Healy v.
James, 408 U.S. 169. 181 (1972). … the majority…cannot force its views on groups that choose
to express unpopular ideas. Government action may impermissibly burden the freedom to
associate [by]"impos[ing] penalties or withhold[ing] benefits from individuals because of their

membership in a disfavored group" and "interfer[ing] with the internal organization or affairs of the group." <u>Roberts</u>, 468 U.S. at 623…"[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." Freedom to associate "presupposes a freedom not to associate." *Roberts. 468 U.S. at 623.* [Forcing] a group to accept for membership someone the group does not welcome and the presence of the unwelcome person "affects in a significant way the group's ability to advocate" its viewpoint, the government has infringed on the group's freedom of expressive association. ..Infringements on expressive association are subject to strict scrutiny; the right of expressive association "may be overridden `by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be  achieved through means significantly less restrictive of associational freedoms.'" *Roberts,* 468 U.S. at 623…[Dale] held that a New Jersey law prohibiting discrimination in public accommodations could not be constitutionally applied to the Boy Scouts to force the Scouts to accept an openly gay scoutmaster….the presence of an openly gay scoutmaster "would significantly burden the organization's right to oppose or disfavor homosexual conduct" and "[t]he state interests embodied in New Jersey's public accommodations law do not justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive association." *Dale, 530 U.S. at 659.…*in *Hurley,* the Court held a public accommodations law could not be constitutionally applied to force a…parade organization to accept a parade unit marching under the banner of an Irish gay and lesbian group… "[w]hen the law is applied to expressive activity…its apparent object is simply to require speakers to modify the content of their expression to…alter it with a message of their own." *Hurley,* 515 U.S. at 578. This…"is a decidedly fatal objective." *Id.* at 579… CLS is a group of people bound together by their shared Christian faith…Members must dedicate themselves to the moral principles embodied in CLS's statement of faith; one of those principles is affirmance of "certain Biblical standards for sexual morality." …CLS is…an expressive association. .. SIU's enforcement of its antidiscrimination policy upon penalty of derecognition can only be understood as intended to induce CLS to alter its membership standards…in order to maintain recognition… requiring CLS to make this change would impair its ability to express disapproval of active homosexuality. CLS is a faith-based organization. One of its beliefs is that sexual conduct outside of a traditional marriage is immoral…forcing it to accept as members those who engage in or approve of homosexual conduct would cause the group as it currently identifies itself to cease to exist…SIU's application of its nondiscrimination policies in this way burdens CLS's ability to express its ideas. *See Roberts, 468 U.S at 623; Dale, 530 U.S. at 659; Hurley,* 515 U.S. at 576, 115 S.Ct. 2338 ("[W]hen dissemination of a view contrary to one's own is forced upon a speaker[,] . . . the speaker's right to autonomy over the message is compromised.")… to justify interfering with CLS's freedom of expressive association, SIU's policy must serve a compelling state interest that is not related to the suppression of ideas and that cannot be achieved through a less restrictive means. *Id.* at 648…the state has an interest in eliminating discriminatory conduct and providing for equal access to opportunities. *Roberts, 468 U.S at 624.,,,*antidiscrimination regulations may not be applied to expressive conduct with the purpose of either suppressing or promoting a particular viewpoint. *Dale,* 530 U.S. at 659-661; Hu*rley,* 515 U.S. at 578-79. "the law…is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one… *Hurley,* 515 U.S. at 579. *Dale, 530 U.S. at 661…*The only apparent point of applying the policy to an organization

like CLS is to induce CLS to modify the content of its expression or suffer the penalty of derecognition…. CLS's interest in exercising its First Amendment freedoms is unquestionably substantial…..CLS has carried its burden of proving a likelihood of success on its claim for violation of its right of expressive association… the consequences of derecognition are [not] too insignificant to constitute a constitutional violation. The Supreme Court rejected this argument in *Healy… Healy* involved an expressive association claim by college students who attempted to form a Students for a Democratic Society ("SDS") chapter at Central Connecticut State College. The college refused to confer official student organization status on the chapter, believing that the organization's philosophy conflicted with university policy. *Healy, 408 U.S. at 174-176.A*s a result of nonrecognition, SDS was not allowed to meet on campus or make announcements about meetings and rallies through university channels like newspapers and bulletin boards. *Id.* at 176. …SDS was still able to meet as a group, but off campus and without the attendant benefits of recognition. The protections of the Constitution, the Court said, are not limited to direct interference with First Amendment freedoms. *Id.* at 183. The Constitution also protects against indirect interference. *Id…*the Court held in *Healy* that SDS's associational rights had been impermissibly infringed because the school refused to confer student organization status and its attendant benefits on SDS. *Id.* at 181-84…the Court drew a distinction between rules directed at a student organization's actions and rules directed at its advocacy or philosophy; the former might provide permissible justification for nonrecognition, but the latter do not. *Id.* at 188-94…CLS was deprived of the same benefits as the student group in *Healy.* Both were frozen out of channels of communication offered by their universities; both were denied university money and access to private university facilities for meetings… the Supreme Court held that the student group's "possible ability to exist outside the campus community does not ameliorate significantly the disabilities imposed by" nonrecognition. *Id.* at 183….. *Dale, Hurley,* and *Healy* provide substantial support for CLS's expressive association claim. CLS has demonstrated a reasonable likelihood of success on its claim for violation of its right of expressive association. The government violates the Free Speech Clause of the First Amendment when it excludes a speaker from a speech forum the speaker is entitled to enter. *Rosenberger,* 515 US at 829-830…SIU has created a speech forum for student organizations and has bestowed certain benefits on those who are qualified to enter the forum…SIU violated its free speech rights by ejecting it from that speech forum without a compelling reason….Speech restrictions in a nonpublic forum must not discriminate on the basis of viewpoint and "must be `reasonable in light of the purpose served by the forum.'" *Good News Club, 533 U.S. at 106-107..O*nce the government has set the boundaries of its forum, it may not renege; it must respect its own self-imposed boundaries. *Rosenberger, 515 U.S. at 829…* even assuming at this stage of the litigation that SIU's student organization forum is a nonpublic forum — making the lowest level of scrutiny applicable — we believe CLS has the better of the argument….SIU's Affirmative Action/EEO policy is viewpoint neutral on its face, but… there is strong evidence that the policy has not been applied in a viewpoint neutral way… CLS is the only student group that has been stripped of its recognized status on the basis that it discriminates on a ground prohibited by SIU's Affirmative Action/EEO policy… other recognized student organizations discriminate in their membership requirements on grounds prohibited by SIU's policy. The Muslim Students' Association…limits membership to Muslims….membership in the Adventist Campus Ministries is limited to those "professing the Seventh Day Adventist Faith, and all other students who are interested in studying the Holy

Bible and applying its principles." Membership in the Young Women's Coalition is for women only…SIU has applied its antidiscrimination policy to CLS alone, even though other student groups discriminate in their membership requirements on grounds that are prohibited by the policy…SIU's …policy…is a standing threat of nonrecognition; assuming it applies, that is the whole point of the policy…CLS has demonstrated a likelihood of success on its claim that SIU is applying its policy in a viewpoint discriminatory fashion. SIU has singled out CLS for derecognition….violations of First Amendment rights are presumed to constitute irreparable injuries, *Elrod, 427 U.S. at 372*... denying official recognition to a student organization is a significant infringement of the right of expressive association. *Healy, 408 U.S at 181*...CLS has shown a reasonable likelihood of success on its expressive association claim under *Healy, Dale,* and *Hurley [as]* …SIU has unconstitutionally excluded it from a speech forum….[and it is] likely that SIU has violated its First Amendment freedoms… the only harm SIU claims is the hardship associated with being required to recognize a student organization it believes is violating its…. antidiscrimination policy…applying that policy in a manner that violates CLS's First Amendment rights…is no harm at all…enter a preliminary injunction against SIU.

 II. Argument
  A. Reasonable Accommodation
1. CWNG's has a Statement of Faith (SOF) (belief in Jesus and his death to atone for sins), to

which its leaders must ascribe and a disciplinary clause (DC), permitting removal of a leader for

conduct the bible says is immoral. Exhibit 3, page 80, line 1-page 81, line 15. Exhibit 7, page 24,

lines 18-24. Esther Hernandez felt these violated policy: if Sandia allowed these it would make it

liable. Undue hardship Sandia is 1) difficulty determining if someone has the beliefs in the SOF,

2) discrimination Sandia would have to defend. Sandia does not monitor. There is no liability.

Exhibit 14, page 20, line 24-page 21, line 7; page 21, line 18-page 22, line 9; page 27, line 8-

page 30, line 9. Sandia denied CWNG's request for religious accommodation. Martin's

counteroffer to reflect language in 1 Timothy and Titus was rejected. Exhibit 7, page 42, line 19-

page 43, line 6. On November 18, 2020 Hernandez revoked Sandia's sponsorship of CWNG.

Exhibit 15, page 97, lines 21-24. Liability is speculative & unlikely due to Title VII's exclusion

for religious organizations. Jim and Hernandez cannot say allowing the SOF and DC affected the

ability of Sandia to conduct its business, productivity, increased workload or employee morale.

Exhibit 12, page 8, line 5-page 10, line 8. Exhibit 14, page 33, line 22-page 34, line 7; page 37, lines 4-17. Sandia did not accommodate, Toledo v. Nobel-Sysco, Inc., supra, Ansonia Bd. of Educ. v. Philbrook, supra, and no hardships resulted, Toledo, 892 F. 2nd at 1489-1490, being purely speculative. id, at 1492. General Motors Corp.,610 F. 2nd 956. 961 *(8th Cir.* 1979),*Burns v. Southern Pac. Transp. Co.,589* F. 2nd 403(9th Cir. 1978). There was no imposition on coworkers or disruption of work routine." *Burns, 589 F. 2nd at 407.* Sandia violated 42 U.S.C. §2000e(j).

B. Freedom of Association

   CWNG associated around shared Christian beliefs stated in the SOF has a right of association,. Griswald v. Connecticut, 381 U.S. 479, 483 (1965) as a Christian group.. Hosanna-Tabor Evangelical Church and School v. EEOC, 565 U.S. 171, 189 (2012). Removal of recognition burdens or abridges that associational right. Healy v. James, 408 U.S. 169, 181 (1972).

C. Religious Discrimination

Sandia deprived CWNG of employment opportunities and discriminated against it regarding privileges of employment due to religion, violating 42 U.S.C. §§2000e-2 & e-2(a) . As in CLS v. Eck, an antidiscrimination policy used to target the SOF and DC & religion. As in CLS v. Walker, 453 F. 3rd 853 (7th Cir. 2006), CWNG was derecognized when it refused to drop its SOF and DC, Exhibit 14, page 73, lines 15-21; page 97, lines 21-24, being forced to accept leaders it does not desire, causing it as it identifies itself to cease to exist, burdening its ability to express ideas. Sandia's only interest in forcing CWNG to accept leaders who do not subscribe to its creed is eradicating beliefs in the creed. The antidiscrimination policy has not been applied in a neutral way. Only CWNG lost Sandia sponsorship. A Preliminary Injunction is suitable. In Hsu v. Roslyn Union F.S.D. No 3, 85 F. 3rd 839 (2nd Cir. 1996) an after-school bible club was denied

recognition because it required that only Christians could be club officers. The SOF and DC are

is essential to the expressive content of CWNG's meetings and the preservation of its purpose

and identity, reasonably designed to ensure that a certain type of religious speech will take place

there. As in Hurley v. Irish American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557

(1995), the decision to exclude is based on its desire to preserve the content of its message. The

nature and quality of the religious speech at the meetings is dependent upon the religious

commitment of the officers. Meetings promote and express the Christian religious experience.

The SOF and DC protected by the 1st Amendment. Abood v. Detroit Board of Educ., 431 U.S.

209, 233 (1977) and the right to not associate. Sandia's ban on them impairs members' ability to

express views that brought them together. Roberts v. US Jaycees, 468 U.S. 609, 623 (1984). It

cannot advocate its desired viewpoints effectively if it cannot confine its leaders to those who

share its religion. N.Y. State Clubs Ass. v. City of New York, 487 U.S. 1, 13 (1988). Removal of

sponsorship due to the SOF and DC was based on the content of the speech. Abandoning them

will cause CWNG tangible harm. Only Christians they have the necessary faith and commitment

to be leaders. Disputes about religious qualifications can be resolved by members. CWNG is a

religious community. Id, 453 F 3rd at 848-850, 856-859, 862-869. A leader with a world view

contradicting its purpose could destroy the group. Individuals who made antisemitic comments

demonstrated this. Exhibit 3, page 32, line 13-page 33, line 8; Exhibit 5, page 199, lines 1-16.

D.  Exemption from Title VII

Title VII exempts religious organizations from its prohibition against discrimination on the

basis of religion. Corp. of Presiding Bishops v. Amos, 483 U.S. 327, 329 (1987);42 U.S.C.

§2000e-1(a) (1970) & Supp II (1972) . Bryce v. Episcopal Church, 289 F. 3rd 648, 655-657 (10th

Cir, 2002). CWNG may retain as leaders those of its own religion, EEOC v. Mississippi College,

626 F. 2nd 477, 486 (5th Cir. 1980) and remove a leader for a conflict of interest, Hall v. Baptist Memorial Health Care Corp, 215 F. 3rd 618, 623, 625 (6th Cir. 2000) or failure to ascribe to a SOF, Killinger v. Sanford University, 113 F. 3rd 196, 198 (11th Cir. 1997), and decide matters of doctrine, Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America, 344 U.S. 94, 116 (1952), establish rules for discipline and adjudicating disputes over these matters. Serbian Eastern Orthodox Diocese for U.S. and Canada, 426 U.S. 696 , 724 (1976).

    E.  Differential Treatment

    As in Alpha Delta Chi v. Reed, 648 F. 3rd 790 (9th Cir, 2011), allowing another group to require members had to be students from Africa established discrimination against a sorority requiring members to be Christians and being denied recognition as a result,. Id, 796, 804.Unlike organizations not approved as a registered student organization in CLS v. Martinez, 561 U.S. 661 (2010) who could use facilities and campus bulletins to announce events, Id, 673, 691, 693. CWNG may not sit on the Executive Council with leadership, use Sandia facilities, campus bulletins or emails, the Sandia Daily News, advertise events on Sandia media,hold recruiting events, host speakers or events at Sandia, or obtain funding. Exhibit 7, page 44, line 5-page 45, line 15. Exhibit 33, page 2, lines 6 & 8-11. Differential treatment is overwhelming:

1.  Employee Resource Groups (ERGs) include BLC, AIOC, HOLA, CWNG, SPAN, ANGLE, Sandia Parents Group, Sandia Women's Action Network (SWAN),Asian Leadership Outreach Committee (ALOC). Exhibit 15, page 48, line 20-page 49, line 13.Clymo, CWNG's executive sponsor, said at 36 executive meetings the topic of CWNG was never brought up. BLC, AIOC, SPAN and SWAN were discussed. Lab Director Younger expressed no interest in CWNG but did in other ERGs, encouraged participation in their events and said "Congratulations." Exhibit 1, page 6, line 23-page 7, line 16; page 8, line 19-page 9, line 15; page 11, lines 1-9; page 12, lines

5-16; page 13, line 13-page 15, line 13. Exhibit 6, page 13, line 6-10, page 15, lines 7-9; Exhibit 4, page 144, line 7-page 145, line 10.

2.  Clymo was the only one who abstained in the vote to fund gender transition surgeries. His performance was excellent. Being advocate for CWNG, senior leadership knew he was a Christian. About the SOF and DC, he said being forced to admit someone into leadership made no sense. Within weeks Younger asked him to resign.    Exhibit 1, page 15, line 14-page 17, line 15; page 18, line 11-page 19, line 23; page 20, lines 5-17; page 23, lines 2-7; page 24, lines 2-14;

3.CWNG speaker Nate Herbst's 2018 speech on Christian apologetics and a 2011 presentation by Stephen Collins on archaeological projects in Jordan proving the accuracy of the bible were not permitted for being "too controversial." Exhibit 10, page 25, lines 7-20; page 29, lines 3-25. Exhibit 4, page 122, lines 2-6 & page 126, lines 2-3. Esther Hernandez told Marie Miller CWNG was not permitted to have a presentation in 2017 by Jonathan Sarfati posted on the Sandia Daily News because he did not believe in evolution, believed in creation and was pro-life, though it concerned cellular biology and how the body replicates cells. Exhibit 9, page 23, lines 7-18; page 25, lines 13-19; page 30, line 7-16. In 2015 John Nevers a Sandia employee, told Hardin he requested approval for CWNG to host atmospheric meteorologist Michael Oard of Answers in Genesis to speak on global warming. When DIVERSITY found out he was a Christian it rescinded approval. Exhibit 23, lines 8-11.Collins said BLC has had speakers. He knows of no BLC requests for them that has been denied. Exhibit 22, page 10, line 16-page 11, line 19. Mar said AIOC has had many speakers. All were approved except one with the Air Force. Mar deposition. Exhibit 8, page 8, line10-page 9, line 11. On February 11, 2021 Sandia sent an e-mail promoting a SPAN event featuring a gay military man's story. Exhibit 31, lines 1 to end.

Hernandez had discretion to decide what speakers were permitted and events funded with no written guidelines; she gave no reason why CWNG's speaker requests were denied. Exhibit 14, page 17, lines 17-24; page 31, line 24-page 33, line 9; page 43, line 1-page 44, line 13. On February 11, 2021 James Peery from Sandia sent an e-mail promoting an event sponsored by the SPAN ERG featuring a homosexual military man and his story to all ERGs. Exhibit 31.

3.  2 investigations were done of Sandia employees for using Christian taglines. Exhibit 3, page 49, lines 17-18; Exhibit 4, page 122, lines 7-10; page 128, line 13-page 129, line 14.

4.  CWNG's collection box and posters were stolen for the toiletry drive for homeless shelters and to help rape victims. Management took no action though this was required. Exhibit 4, page 122, lines 14-16. Amy Tapia of Sandia was told by Jared Colombel that in October 2019 the flyers for donations to a food charity by CWNG were taped to boxes were removed with vandalism. She does not know if she had authority to take action or if Sandia could make an announcement or take action. Exhibit 18, page 4, line 23-page 7, line 17.

5.   Consecutive meetings with Stephen Younger were cancelled to discuss diversity training and discrimination against CWNG. Exhibit 4, page 138, line 13-page 139, line 10. Other ERG chairs Colombel spoke to said none of their meetings were cancelled. Exhibit 4, page 140, lines 7-12.

6.  BLC received funding--labor for members. None of its requests for funding were denied or granted for less than the full amount requested. Sandia paid honoraria for its speakers. ERGs received $88,136-$193,781 for the years 2019-2022 (budgeted $116,000 for 2019 and $112,00 for 2020. CWNG received nothing and had a $700 budget funded by donations. Exhibit 22, page 11, lines 20-page 12, line 19. Exhibit 25, page 1, line 14. & page 5, lines14. Exhibit 4, page 110, lines 17-21. Other ERGs got funding for leaders' labor. Exhibit 20, page 42, lines 19-25.

16

7.  IDEAS sponsors diversity cinema. CWNG signed up for slots and submitted them to IDEAS,

but it would not approve ideas CWNG submitted. Exhibit 4, page 120, lines 1-4; 125, lines 18-21.

8.  Marie Miller was forced to retract an e-mail asking for prayer for an antiabortion event and

tell those who received it to to disregard it. Exhibit 9, page 15, line 20-page 17, line 1.

9.  AIOC's charter stated its leaders had to be of American Indian descent. On September 22,

2020 Aaron Jim told Martin Sandia is in the process of instructing AIOC to open its leadership to

all. Jim said "it is a difficult question to answer" whether AIOC did so. He does not know the

date AIOC changed the charter, never monitored the AIOC to review the amended charter so it

no longer required its leaders to be American Indian and does not know if it still has the

American Indian descent requirements for its leaders. He did not require AIOC to submit a

revised charter because once AOOC took the charter down it no longer violated HR008. He did

not follow up because "I wasn't responsible for reviewing ERG charters." He only had verbal--

not written--confirmation AIOC and BLC changed their race-based leadership requirements. Ben

Mar from AIOC said the old charter was taken down from the website. Hill confirmed BLC

made the updates but not AIOC. Jim did not ask its leader Chris Collins if BLC charters required

leaders to be black or know if he gave Jim a copy of the charter or discussed with him amended

language to be put in it. He required CWNG to submit its charter to him. Exhibit 11, page 22,

line 13-page 31, line 22; page 32, line 21-page 34, line 22. Exhibit 28, page 2, lines 1-12.

10.  Collins stated since 2019 BLC has had no white leaders, The 1980 charter stated one had to

be black to be a leader.The September 21, 2020 email shows the 1980-2020 charter term "All

Black on-roll employees are eligible for membership in the committee…All Black Employees

may hold ad hoc membership in for specific subcommittees of projects." He does not recall

changing leadership requirements. He cannot say why the new draft never mentions leadership requirements. The change does not say all Sandia employees may be a leader of BLC. He did not know if ERGs had to change leadership requirements but knew CWNG had to. The early draft says one must be black to be on a subcommittee but the revision nowhere states requirements to be on a subcommittee or mentions leaders. He recalls no discussion with Jim on whether leadership was required to be black or reading the new charter to Jim and does not know whether the new charter requires the leadership to be black. Exhibit 22, page 9, lines 16-23; page 38, lines 13-18; page 39,    line 4-page 43, line 16; page 45, lines 2-19; page 47, line 15-page 48, line 17.

11. The SPAN charter states membership is open to all employees interested in fostering an inclusive atmosphere for LGBTQ+ employees, contractors and allies. Exhibit 29, Page 3.

12. There are no strategic plans, charters or constitutions, leadership or disciplinary clauses for Military Support Committee , Sandia Parents Group, ERGs at Sandia. 5th Affidavit of Timothy J. Miller, Jr., Exhibit 34, page 1, lines 12-16.

13. CWNG was told to broaden its charter so <u>any</u> employee of Sandia could be a leader of CWNG. Exhibit 20, page 15, lines 11-25; page 16, lines 1-9..

14. Amanda Ellis told Martin May 20, 2020 he violated Sandia policy by encouraging people to vote in a NM primary in an e-mail, based on regulations,which does not state encouraging people to vote violates the policy if it mentioned no candidate or party or whom to vote for. She never asked Sandia's legal department. In June 2020 Tapia sent an e-mail to Liz Gallegos, HOLA ERG and others inviting them to volunteer for Albuquerque City Community Policing Council,a political group. FAR nowhere mentions encouraging people to vote; it supplies information on elections. She knew he was part of CWNG. Exhibit 13, page 5, line 4-page 17, line 6.

15.  Kelsie Carpio Giron paid speakers for the BLC, SWAN, and Womens' Network Action in the full amount requested. She knows of no requests for paying speakers that was rejected or for which the entire amount requested was not paid. Hill said Sandia fully funded all requests by SWAN, BLC, Abilities Champions of Sandia and other ERGs. Honoraria was up to $3500. Exhibit 19, page 5, line 22-page 12, line 14. CWNG requested $400 for a speaker from the Pentagon & received $250. Exhibit 4, page 11, page 12-16.

16.  In 2019 Colombel was told by Kuca he could not have the signature block "Jesus gave it all." Hill said no other employee was told he could not have a signature block. It was to be "professional." Exhibit 20, page 45, lines2-11; page 47, lines 3-11; , page 35, lines 12-20.

17.  Terry Hardin, an employee of Sandia active as a member of CWNG in 2001 learned Sandia management told CWNG to remove links from its website within the Sandia system to Focus on the Family and American Family Association, Christian organizations. He saw the link before with these references and after they had been removed. Exhibit 23, lines 5-8.

18.  In 2018-2019 Sandia put up the PRIDE flag--the rainbow flag for the LGBT group. Colombel told Hardin a representative of CWNG asked for permission from Sandia for CWNG to put up the Christian flag and was told by Sandia it could not be flown. Exhibit 23, lines 11-14.

19.  The Strategic Plan for FY 2020 for the Disability Awareness Committee (DAC) states "Membership in the (DAC) is open to all Sandians who have an active interest in promoting the DAC goals, and who have demonstrated commitment to disability issues... The DAC chairperson shall be a member of the Equal Employment Opportunity and Affirmative Action (EE0/AA) Department, selected by EEO/AA management." Exhibit 35, page 5, lines 2-3 and 7-8.

20. Sandia Women's Action Network FY20 Strategic Plan states "Council Selection: Council Members are selected by Co-Chairs. Self-Nominations are Solicited from the SWAN membership. Preference is given to members that have supported council activities. Council Membership Should Include a Balance of Mission and Mission Support Employees and represent a diverse group of employees." Exhibit 36, page 5, lines 41-44 from top of page.

21. Sandia Asian Pacific Leadership Committee FY21 Strategic Plan States: "Council Selection: Council Team Members are selected by Chairs/Vice Chairs. Self-Nominations are Solicited from the ERG membership. Preference is given to members that have supported council activities. Council Membership Should Include a Balance of Mission Delivery and Mission Enabling Employees and represent a diverse group of employees." Exhibit 37, page 4, lines 21-24 Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819 (1995) held selecting for disfavored treatment religious content journalism is impermissible viewpoint discrimination. Id, 830-831.   This differential treatment violates the First Amendment.

F. Viewpoint Discrimination

CWNG's SOF includes belief in the diety of Jesus Christ, his virgin birth, resurrection, and atonement of sin through his sacrifice on the cross, and the authority of the bible, foundations of Christianity. Exhibit 3, page 80, line 9-page 81, line 25. Its DC states "Based on biblical principal...any person that involved in behavior that contradicts clearly defined issues outlined in scripture will not be considered for a leadership role. Exhibit 7, page 27, lines 9-13.Colombel was told by Jim and Hernandez CWNG must revise this to comply with HR008 to permit any member of Sandia to be a leader, which is discrimination because of religion. Exhibit 38, lines 1-5. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-12, (1993). The antidiscrimination policy interpreted to hold that only Christian beliefs violate it is prima facie case of discrimination.

Thomas v. Nat'l Ass'n of Letter Carriers, 225 F.3d 1149, 1155 (10th Cir. 2000). Sandia's

nondiscriminatory reason, Reynolds v. Sch. Dist. No. 1, 69 F.3d 1523, 1533 (10th Cir. 1995)--is

to comply with HR008 but it violated the religious exemption to Title VII,    made no attempt to

accommodate so as not to burden religion, Fulton, supra, Abercrombie & Fitch Stores, Inc., supra.

Sandia's proffered reason is pretextual,, Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1165 (10th

Cir. 1998) due to weaknesses or contradictions in its reason--to enforce HR008. HR008 is

facially unenforceable because it does not incorporate the religious exemption and was unequally

applied . Morgan v. Hilti, Inc., 108 F. 3rd 1319, 1323 (10th Cir. 1997). A negative judgment on

religious activity violates the First Amendment, Church of the Lukumi Aye, Inc. v. City of

Hialeah, 508 U.S. 520, 533, 537-538 (1993) as shown by overwhelming evidence:

   1.In 2019 Kuca asked Colombel to perform roles for which he did not have knowledge and for

which he was not hired soon after he filed a complaint with Hill on another employee. Anna

Lorenz came to his office, sat on the floor for 5-7 minutes, was very loud, refused to leave and

made antisemitic remarks and demanded she be elected to the steering committee of CWNG. A

week later he given a notice of poor performance. Colombel was a top performer. He complained

about retaliation to Kuca and said his participation with CWNG made him a target. Kuca told

him if he could demonstrate a year of strong performance he would be promoted. His manager,

Dave Skousen, gave him a stellar review and he had 7 years of top performance reviews. After

the year Kuca said "it's not one year, it's 2" and would not submit him for a promotion.    Exhibit

3, page 29, line 24-page 30, line 23; page 31, line 21-page 33, line 12; page 38, lines 8-23; page

39, lines 11-15; page 45 line 4-page 46, line 13.

      2.Kuca told him the entire management chain, every manager up to Marcus, was upset at him

for his Christian tagline, in 2018-2019. Exhibit 3, page 49, lines 17-25. Lab Director Younger

told him he said "there is no advocacy allowed" for a Christian world view. Clymo was cut off

from CWNG without explanation. Exhibit 4, page 123, line 7-page 124, lines 6 & 14-17.

 3.Diversity and Inclusion training called out Christians calling them Insiders. Exhibit 4, page

125, lines 10-17. Colombel spoke to Sandia leadership about this. He asked Younger not to

dismiss the biblical world view because it was Christian. Exhibit 4, page 126, lines, 17-23. In

April 2019 he complained to Mark Sellers and Esther Hernandez about the diversity training

materials. Clymo agreed to strike verbiage and was going to talk to leadership about it. At the

diversity training with IDEAS were trainers, White Men as Diversity Partners (WMADP) who

distributed content segregating "insiders" vs "outsiders." Insiders had privilege. Christians were

listed as insiders. The training mentioned relinquishing privilege. It stated heterosexual, straight

Christians had privilege. At the April 14, 2019 meeting, with leaders present,a classmate called

Colombel "disgusting" when they found out he was a Christian and another said in front of the

whole group "There was something about you that makes me sick to my stomach." Exhibit 4,

page 137, lines 7-24; page 142, line22-page 143, line 7; page 144 line 12-page 146, line 13.

Exhibit 6, page 13, lines 5-10; page 15, lines 4-9. Exhibit 26, page 8, and page 9 (first 9 lines).

He sent an e-mail about training, with responses. Exhibit 27, pages 1-7.

4. Mark Sellers, associate lab director 2018-2020, attended a Diversity and Inclusion training

meeting April 3-4, 2019 and discussed Colombel's concerns the training had discriminatory

content. He cannot say for certain that Colombel did not state at that meeting the training could

inflict damage on those who identify as Caucasian, male. straight or Christian and ask that his

concerns be put on the agenda for a future ERG meeting. They had no future meetings to address

his concerns. As part of executive leadership he sponsored ALOC and Division Diversity and

Inclusion Ambassadors ERGs. Colombel after attending the summit sent an e-mail to the entire

division outlining his concerns with the training. Sellers responded. They met as a result and

agreed to disagree. Exhibit 17, pages 4, line 22-page 8, line 5; page 9, lines 1-23.

4. Colombel told Sellers and Hernandez what happened and how he was called out for being

a Christian. They called it "very healthy training,"Hernandez said their experience with WMADP

was good. Exhibit 4, page 148, line 8-page 149, line 8. Colombel told then it was not productive

and gave them a document on critical race theory, the Invisible Knapsack by Peggy McIntosh.

Exhibit 4, page 149, line 11-page 150, line 2. Exhibit 5, page 195, line 21-page 196, line 16.

5.Younger rebuffed Colombel's world view and was angry in a public meeting after he said

the Christian world view needed advocacy. Colombel said "taking this off the table… says it is

not true." Exhibit 5, page 193, lines 18-24 & page 198, line 25-page 199, line 2.

6.Colombel presented a white paper, e-mails and responses from other individuals about

training being bigoted to Sellers and Hernandez. The e-mail went to the whole entity by accident

and got 14 responses. He received e-mails people "don't like what," and management said

there's a lot of stuff they did not like that he was doing. Sandia's treatment caused a stomach

issue. He could not practice his religion without repercussions. Being an open Christian was very

hard. He could not be open with his faith. His religious freedom was burdened by his groups' not

being permitted to have a SOF or DC or speakers.The environment was hostile to Christianity.

He could not fully and freely be himself as a Christian. Exhibit 6, page 14, lines 4-6; page 15,

lines 4-9; page 19, lines 21-23; page 21, lines 8-14; page 37, lines 5-9; page 41, lines 15-24.

7.Esther Hernandez told Martin a Christian ERG wasn't preferred and the best practice was for

CWNG to become an "All Faiths Group." Exhibit 7, page 40, line 12-page 41, line 4.

8.After loss of sponsorship, CWNG prayed but could not use the Sandia Daily News. In Dec. 2018 Marie Miller told Younger CWNG was curtailed from having a scientific presentation. Younger said "We can't have anything that's too controversial. It's going to upset someone." Exhibit 9, page 38, line 11-page 39, line 8.

9.HR008 nowhere mentions religious exemption to Title VI, reasonable accommodation of religious beliefs, or RFRA. Exhibit 30, Page 1, page 2, lines 1-10, page 3, lines 5-19. Hernandez and Jim never heard of it or RFRA and never saw the 2020 federal guidelines for religious exemption.   Exhibit 11, page 8, line 10-page 10, line 17. Exhibit 14, page 23, lines 16-25.

10.Hill admitted Colombel complained about the training, wanted that issue put on the agenda of an ERG/ Executive Council meeting. It never was. Sandia ignored his complaints. Exhibit 20, page 12, line 15-18; page 13, lines 8-24; page 14, line 22-page 15 line 4.

11.CWNG is     the only ERG which lost sponsorship. Kuca admitted Colombel was a superior worker. Exhibit 21, page 7 lines 2-9;page 13, lines 18-20; page 17, lines 2-14. As in Fulton v. City of Philadelphia, 141 S. Ct. 1868 (2021), Sandia had total discretion to determine which speakers, comments about voting, taglines, charity drives, Diversity Cinemas, flags, agenda items, investigation of complaints, handouts at antidiscrimination training, religious exemptions under Title VII, religious accommodation and budgeting decisions were permitted s. Her power of entirely discretionary exceptions renders HROO8 not generally applicable. Speculation of liability is sufficient. Brown v. Entertainment Merchants Assn., 564 U.S. 786, 799–800 (2011). Hostility to religion, . Masterpiece Cake Shop Ltd. V. Colo. C.R. Comm,, 138 St. Ct. 1719 (2018) and discretionary application of HROO8 involving a negative judgment on

religious activity, <u>Church of the Lukumi Aye, Inc. v. City of Hialeah</u>, 508 U.S. 520, 533, 537-538

(1993), violate the First Amendment. Sandia derecognized CWNG from Sandia because of its

views, <u>Healy v .James</u>, 408 U.S. 169. 187-188 (1972), singling it out for disadvantageous

treatment. Its actions are subject to strict scrutiny; the interest in enforcing antidiscrimination law

is not sufficiently compelling to justify viewpoint discrimination against religious speech.

<u>Widmar v. Vincent</u>, 454 U.S. 263, 270, 276 (1981).

    G.<u>RFRA</u>

Sandia's website   <u>https://www.sandia.gov/about/</u> states:

In keeping with our vision to be **the nation's** premier science and engineering laboratory for national security and technology innovation…Sandia received $3.9 billion in funding in FY20, Oct. 1, 2019, through Sept. 30, 2020. Most of that came through U.S. Department of Energy funding, including $2.4 billion under the DOE's National Nuclear Security Administration. Weapons Activities accounted for nearly $2.2 billion of the NNSA portion and Defense Nuclear Nonproliferation received $260 million. Nuclear Deterrence, 59.7% • Global Security, 16.7% • National Security Programs, 13.8% • Energy and Homeland Security, 7.3% • Advanced Science & Technology, 2.6%…Sandia…is a Federally Funded Research and Development Center, whose **facilities are owned by the U.S. government**. **The government manages and operates Sandia and the other national laboratories using a government-owned, contractor-operated model. …**Congress made Sandia a Department of Energy (DOE) **national laboratory…**on Dec. 29, 1979. Sandia performs a critical function for **national defense**: as the engineering arm of the **nation's nuclear weapons enterprise**, we ensure that nuclear weapons will always work when authorized by the president of the United States…The technical capabilities and expertise that Sandia applies to creating effective **nonproliferation and arms control solutions grew and has been sustained because of its unique role in the U.S. nuclear weapons enterprise**…. Sandia-developed satellites, engineering and materials contribute to **U.S. space exploration. National Security is our business**. We strive to become **the laboratory that the U.S. turns to first for technology solutions to the most challenging problems that threaten peace and freedom for our nation and the globe. Security. Nuclear Weapons. Energy.**

Clymo stated Sandia is an instrumentality of the Department of Energy (DOE), funded by the

Federal Government. The National Nuclear Security Administration, NNSA, is an agency of the

DOE. NNSA funds Sandia, about 85 percent of their total budget, the rest comes from other

agencies, such as the Office of Science. Sandia takes direction and approval for expenditure of

funds from the DOE, its employees of Sandia are subject to the rules and regulations regarding federal employees, in matters of security, clearance, behavior, use of government property, protection of government property. Antidiscrimination laws for federal employees apply to Sandia. "We take the what directly from Department of Energy, NNSA employees. What they don't give us is the how. So they can tell us what to do. They just can't tell us how to do it. Sandia is an instrument of -- of the DOE through NNSA. Exhibit 1, page 37, line 1-page 39, line 25. Parsons, CFO for Sandia, stated its $4.4 billion budget is 99% funded by the federal government. It supports numerous federal agencies, takes orders from DOE, which issues it an annual performance evaluation. Most of the land on which Sandia has its facilities, and all computers and equipment are owned by the federal government. It uses federal government classifications for security. It does not serve private client. He did not deny Sandia is an instrumentality of the federal government. Exhibit 2, page 5, line 22-page 11, line 15.   Colombel and Martin said Sandia has federal government security clearances and is involved in areas exclusive to government--nuclear weapons and satellite development, advice on decisions throughout the US government, treaties, international treaties, & defense strategy in energy policy. Exhibit 5, page 183, line 4-page 185, line 21. Exhibit 7, page 53, line 13-page 55, line 14. No private entity provides defense strategies to the federal government. When Martin worked for Sandia he was classified as a federal employee. "Government" includes a department, agency, instrumentality, and official or other person acting under color of law of the U.S. or of a covered entity. 42 USCA§2000bb(2)(1).Action affecting Plaintiff was compelled or influenced by state regulation, id 842. On June 25, 2021 President Biden's Executive Order 13583 (of August 18, 2011 established a Coordinated Government-Wide Initiative to Promote Diversity and Inclusion in the

Federal Workforce).On August 29, 2018, Defendant Sandia implemented a new policy, HR008.

Its enforcement resulted in the ban on CWNG's SOF and DC. RFRA applies.

H. Injunctive Relief

Loss of First Amendment freedoms is irreparable injury.*Elrod v. Burns, 427 U.S. 347 (1976)As*

*in CLS v. Walker, CWNG* has shown a likelihood that Sandia violated CWNG's free

speech  rights by ejecting it from a speech forum in which it had a right to remain. The Religious

exemption allows CWNG to have the SOF and DC. CWNG is a private speaker distinct from

Sandia's. Antidiscrimination regulations may not be applied to expressive conduct to suppress a

particular viewpoint. Boy Scouts of America v. Dale, 530 U.S. 640, 659-661 (2000) Hu*rley,* 515

U.S. at 578-79. HR008 was applied to CWNG to modify the content of its expression or suffer

derecognition. CWNGs interest in exercising its First Amendment freedoms is substantial.

Disapproval of CWNG's expression does not justify Sandia's effort to compel it to accept

members  where such acceptance would derogate from the organization's expressive

message." *Id.* at 661.Healy v. James, 408 U.S. 169, 181 (1972) held associational rights were

impermissibly infringed because the school refused to confer student organization status and its

benefits. *Id.* at 181-84. There [are] rules directed at a student organization's actions and rules

directed at its advocacy or philosophy; the former [may justify] nonrecognition, but the latter do

not. *Id.* at 188-94.CWNG was deprived of the same benefits as in  *Healy:* frozen out of channels

of communication offered and denied money and access to facilities for meetings. …Sandia

created a speech forum for ERGs and has bestowed certain benefits for them.. Sandia ejected

CWNG from that forum for no compelling reason. Speech restrictions in a nonpublic forum must

not discriminate on the basis of viewpoint and "must be `reasonable in light of the purpose

served by the forum.'" *Good News Club v. Milford Central School, 533 U.S. 98, 106-107*

*(2001)..*Once the government has set the boundaries of its forum, it…must respect its own self-imposed boundaries. *Rosenberger, 515 U.S. at 829…* If the ERG forum is a designated public, nonpublic forum, or nonpublic forum, CWNG is entitled to an injunction. HR008 is viewpoint neutral, but ignores the religious exemption and there is strong evidence it has not been applied in a viewpoint neutral way. CWNG is the only ERG stripped of its recognized status on the basis that it discriminates on a ground prohibited by HR008.. Other ERGs requires belief in their views or some requirement other than being a Sandia employee to be a leader. Sandia applied its antidiscrimination policy to CLS alone. It is treated differently in terms of speakers, events, funding, discussion at Executive Board meetings, and many other areas. CWNG has demonstrated a likelihood of success on its claim that Sandia is applying its policy in a viewpoint discriminatory fashion and singled out CWNG for derecognition due to rampant evidence of antichristian hostility. Violations of First Amendment rights are irreparable injuries, *Elrod, 427 U.S. at 372. D*enying official recognition to an ERG is a significant infringement of the right of expressive association. *Healy, 408 U.S at 181…The o*nly harm Sandia claims is the hardship of violating HR008. But if it is applied in a manner that violates CWNG's First Amendment rights — as is likely — Sandia's claimed harm is no harm at all.

WHEREFORE, Plaintiff seeks relief as per the attached order.

Date: July 27, 2023

s/J. Michael Considine, Jr., P.C.
By: J. Michael Considine, Jr.
1845 Walnut Street, Suite 1199
Philadelphia, PA 19103
adventure7@gmail.com
Counsel for Plaintiff

CERTIFICATE OF SERVICE

I, J. Michael Considine, Jr., hereby certify that I filed electronically the Motion (Renewed)for Summary Judgment and for Injunctive Relief and transmitted it to counsel of record Melissa

Kountz, **Charles J. Vigil and Samantha M. Hults,** <u>Rodey, Dickason, Sloan, Akin & Robb,</u> <u>P.A.,</u> **201 3rd Street, NW, Suite 2200, Albuquerque, NM 87102 and Aaron C. Viets, Sandia National Laboratories. P.O. Box 5800, MS 0141, Albuquerque, NM 87185** on the date indicated below:

Date: July 27, 2023                                              s/ J. Michael Considine, Jr.